CALDWELL LESLIE & PROCTOR, PC
ANDREW ESBENSHADE, State Bar No. 202301
esbenshade@caldwell-leslie.com
1000 Wilshire Blvd., Suite 600
Los Angeles, California  90017-2463
Telephone:  (213) 629-9040
Facsimile:  (213) 629-9022

```
┌─────────────────────────────────┐
│            FILED                │
│ CLERK, U.S. DISTRICT COURT      │
│                                 │
│        MAY - 5 2010             │
│         11:52am                 │
│ CENTRAL DISTRICT OF CALIFORNIA  │
│ BY                     DEPUTY   │
└─────────────────────────────────┘
```

Charles E. Tompkins (*pro hac vice* application pending)
ctompkins@shulaw.com
Todd S. Heyman (*pro hac vice* application pending)
theyman@shulaw.com
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Tel: (617) 439-3939
Fax: (617) 439-0134

*Attorneys for Plaintiff and the Proposed*
*Classes*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

RDA Construction Corp., on Behalf of
Itself and all Others Similarly Situated,

Plaintiff,

vs.

TRELLEBORG AB; VIRGINIA
HARBOR SERVICES, INC. D/B/A
SEAWARD; SEA WARD
INTERNATIONAL INC.; SEA
WARD HOLDINGS, INC.; FENTEK
MARINE SYSTEMS GMBH;
URETHANE PRODUCTS
CORPORATION; MARINE
FENDERS INTERNATIONAL, INC.;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CV 10- 03360

RGK
SSx

Civil Action No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

-1-

WATERMAN SUPPLY COMPANY, )
INC.; NEXTWAVE MARINE LLC; )
PLASTIC PILINGS, INC.; )
MARITIME INTERNATIONAL, )
INC.; FRANK MARCH; ROBERT B. )
TAYLOR; DONALD MURRAY; )
PETER NILSSON; WILLIAM ALAN )
POTTS; GERALD THERMOS; )
SEYMOUR WATERMAN; ANDREW )
BARMAKIAN; JOHN DEATS; )
TOMAS CRAWAACK; PROMAR )
(A.K.A. PROMAR LLC OR PROMAR )
CORP.); FENDERCARE MARINE )
SOLUTIONS; JAMES FISHER PLC; )
THE YOKOHAMA RUBBER )
COMPANY, LTD.; BRIDGESTONE )
CORPORATION; BRIDGESTONE )
INDUSTRIAL PRODUCTS )
AMERICA, INC.; and SUMITOMO )
RUBBER INDUSTRIES, LTD., )
                          Defendants. )
                                      )

Plaintiff RDA Construction Corp. ("RDA"), one of the leading marine

contractors in New England, ("Plaintiff"), on behalf of itself and all others similarly

situated, brings this action for treble damages and costs of suit under the antitrust

laws of the United States against Defendants Trelleborg AB; Virginia Harbor

Services, Inc. d/b/a SEAWARD; Seaward International Inc.; Seaward Holdings,

Inc.; Fentek Marine Systems GmbH; Urethane Products Corporation; Marine

Fenders International, Inc.; Waterman Supply Company, Inc.; Nextwave Marine

LLC; Plastic Pilings, Inc.; Maritime International, Inc.; Frank March; Robert B.

Taylor; Donald Murray; Peter Nilsson; William Alan Potts; Gerald Thermos; Seymour Waterman; Andrew Barmakian; John Deats; Tomas Crawaack; ProMar (a.k.a. ProMar LLC or ProMar Corp.); The Yokohama Rubber Company, Ltd.; FenderCare Marine Solutions; Bridgestone Corporation; Bridgestone Industrial Products America, Inc.; James Fisher PLC; and Sumitomo Rubber Industries, Ltd. ("Defendants").  As was the case with the Complaint filed in the action *Board of Trustees of the Galveston Wharves, et al. v. Trelleborg AB, et al.*, CV-10-2319 GW-(FFMx) (March 30, 2010), the allegations regarding the Defendants are drawn largely from the facts alleged in the *qui tam* action *The United States of America ex rel. Douglas Farrow, et al. v. Trelleborg AB, et al.*, 05-CV-00381-GW (SGLx) (unsealed February 19, 2010).  These allegations are thus made on information on belief.  The allegations relating to Plaintiff and the products in question, however, are made based on the corporate knowledge of the Plaintiff.

## NATURE OF CLAIM

1.     This case arises from three related and overlapping conspiracies involving several marine products.  As set forth below, the conspiracies were intertwined and consisted of many of the same Defendants and related products.

2.     The first conspiracy involves an unlawful agreement to fix prices, rig bids and allocate the market in the United States for foam-filled marine fenders and

ancillary products ("Foam-Filled Fenders") and foam-filled buoys and ancillary products ("Buoys") (together, "Foam-Filled Fenders and Buoys").

3.     The second conspiracy involves a similar unlawful agreement to fix prices, rig bids and allocate the market in the United States for plastic marine pilings and ancillary products ("Marine Pilings").

4.     The third conspiracy involves an unlawful agreement to fix prices, rig bids and allocate the market in the United States for marine fenders and ancillary products other than Foam-Filled Fenders, including but not limited to, fixed fenders and pneumatic fenders ("Marine Fenders").

5.     As a result of these illegal conspiracies, Defendants charged supra-competitive prices for Foam-Filled Fenders and Buoys, Marine Pilings, and Marine Fenders in the United States thereby injuring Plaintiff and members of the Foam-Filled Fenders and Buoys Class (defined below), Marine Pilings Class (defined below), and Marine Fenders Class (defined below) (collectively, the "Classes").

6.     As set forth below, Defendants Virginia Harbor Services, Inc., Frank March, Robert B. Taylor, Donald Murray, William Alan Potts, Gerald Thermos, and Andrew Barmakian have already pleaded guilty to engaging in a conspiracy to unlawfully rig bids and allocate markets for the sale of Foam-Filled Fenders and Buoys and/or Marine Pilings pursuant to a criminal investigation launched by the United States Department of Justice's Antitrust Division ("DOJ").

7.     Additionally, on July 22, 2009, the DOJ as well as the States of Florida and California intervened in a pending qui tam lawsuit brought by whistleblower Douglas Farrow, a current executive of Defendant Urethane Products Corporation.

8.     The qui tam lawsuit, which was filed in 2005, was partially unsealed by Judge George H. Wu of the U.S. District Court of the Central District of California on February 19, 2010.

9.     On February 26, 2010, the DOJ announced that it had negotiated settlements with several of the Defendants.   Trelleborg AB and four of its subsidiaries agreed to pay $14 million to settle the qui tam action that alleged they participated in an unlawful conspiracy to fix prices, rig bids and allocate markets for marine hose, Foam-Filled Fenders and Buoys, Marine Pilings, and Marine Fenders purchased by the U.S. Navy and other federal departments and agencies.

10.    In addition, Defendants Bridgestone Industrial Products America, Inc. and The Yokohama Rubber Co. Ltd. contributed $178,108 and $173,410 respectively to settle the qui tam action.

## JURISDICTION AND VENUE

11.    This action arises under Section 1 of the Sherman Act and Section 4 of the Clayton Act, 15 U.S.C. §§ 1 and 15.

12.    This Court has jurisdiction under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d). Defendants are found and transact business in the District and/or the claims arose at least in part in the District.  Defendants regularly and continuously conduct business in interstate and foreign commerce between and among the United States and foreign countries. The interstate trade and commerce relevant to this action has been carried out, in part, within the District.

## PARTIES

14.     Plaintiff is a large Massachusetts general marine contractor responsible for completion of the vast majority of the major marine contracting projects in the Boston area.  Plaintiff specializes in major marine construction, pile driving and bridge construction projects, as well other large marine-related construction projects. Plaintiff is among the leading marine contractors in New England.

15.     Plaintiff has performed numerous marine construction projects awarded by, among others, the Massachusetts Port Authority; The Massachusetts Bay Transportation Authority; The Massachusetts Highway Department; The National Oceanic and Atmospheric Association; The Woods Hole, Martha's Vineyard and Nantucket Steamship Authority; the United States Coast Guard; and a variety of other entities large and small throughout the New England area.  Plaintiff has begun the process of reviewing records of its purchases of the products at issue from the

Defendants, and, while that process is not yet complete, it is already clear that Plaintiff has purchased at least six hundred thousand dollars worth of relevant marine products directly from the Defendants during the time period in question in the complaint.

16.     It is typical in the marine construction business for contractors such as Plaintiff to purchase Marine Fenders, Buoys, and similar items directly from entities such as the Defendants. The cost of those items, typically along with some minimal markup to compensate Plaintiff for the purchasing process, is then included in the contract price for the work performed for a port or other shipping-related entity. Thus, for example, when Plaintiff performs marine contracting work for entities such as the Massachusetts Highway Department, Plaintiff, rather than the Massachusetts Highway Department itself, typically purchases items at issue in this complaint directly from the Defendants. Plaintiff's understanding of the industry, based on over 30 years of experience working with various ports, wharfs, and bridge projects in the Northeastern United States, is that Plaintiff's purchasing procedures are standard in the industry. Accordingly, marine contractors such as Plaintiff typically are the direct purchasers of the products in question, while ports, wharves, docks, and other similar types of entities often are indirect purchasers of the products in question.

17.     While Plaintiff's investigation into its purchases is ongoing, it already is clear that, during the Foam-Filled Fenders and Buoys Class Period (defined below), the Marine Pilings Class Period (defined below), and the Marine Fenders Class Period (defined below), Plaintiff purchased Fenders directly from one or more of the Fenders and Buoys Defendants (defined below) and Marine Pilings directly from one or more of the Marine Pilings Defendants (defined below).  As a result, Plaintiff was damaged by each Defendant's and their co-conspirators' unlawful conduct.

18.     Defendant Trelleborg AB (a.k.a. Trelleborg Group) ("Trelleborg") is a business organization with headquarters in Trelleborg, Sweden and business operations at locations throughout the world, including the United States and Germany.  Trelleborg AB is comprised of four business units that each provide polymer or rubber products to a broad range of industries.  Trelleborg AB's marine operations are organized within the Trelleborg Engineered Systems ("TES") business unit.

19.     Defendant Seaward International Inc. ("SII") is a corporation organized under the laws of the State of Virginia, with offices located in Clear Brook, Virginia.

20.     Defendant Seaward Holdings, Inc. ("SHI") is a corporation organized under the laws of the State of Virginia, with offices located in Clear Brook,

Virginia.  Plaintiff is informed and believes that SHI acquired SII in 1999 and that SHI dominates and controls SII.  The term "Seaward" herein refers to SHI and SIT. Until its acquisition by Trelleborg in December 2002, Seaward was one of the largest producers of Foam-Filled Fenders and Buoys in the United States.  Plaintiff is informed and believes that most of SHI's assets and operations, including the Seaward Foam-Filled Fenders and Buoys manufacturing operation, were acquired by Trelleborg Engineered Products, Inc. ("TEP") around December 18, 2002.

21.    Defendant Virginia Harbor Services, Inc. d/b/a SEAWARD ("Virginia Harbor Services") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 3470 Martinsburg Pike, P.O. Box 98, Clear Brook, Virginia, 22624. Virginia Harbor Services, previously known as TEP, is a corporate subsidiary of Trelleborg.  On or about July 25, 2007, Trelleborg caused TEP to change its name to Virginia Harbor Services. Unless stated otherwise, Virginia Harbor Services shall hereafter be referred to as "VHS/TEP."   On or about December 2002, VHS/TEP acquired the business interests of Seaward.   Selling under the "Seaward" brand, Defendant Virginia Harbor Services is one of the world's leading manufacturers and suppliers of Foam-Filled Fenders and Buoys.

22.    Defendant Fentek Marine Systems GmbH ("Fentek") is a business organization with its headquarters in Hamburg, Germany and offices at different

locations throughout the world, including an office in the State of Virginia. Fentek is part of TES and, upon information and belief, is a wholly-owned business unit of Trelleborg. Since approximately 2001, Fentek has been dominated and controlled by Trelleborg. Between at least approximately 2001 through 2006, Thomas Crawaack was the company's president. Prior to 2001, Thomas Crawaack was the principal owner and operator of Fentek.

23. Defendant Frank March ("March") is the majority shareholder of SHI. He was the majority shareholder of SII before it was acquired by SHI, and has been the alter ego of SII and SHI, respectively, during the Foam-Filled Fenders and Buoys Class Period (defined below). March actively participated in, implemented, directed, and authorized the wrongful conduct hereinafter alleged by Seaward and VHS/TEP. In or around December 2002, March authorized the sale of Seaward's operations to Trelleborg (or one of its business units) for approximately $10 million.

24. Defendant Robert (a.k.a. "Bob") B. Taylor ("Taylor") was the principal owner and operator of Defendant ProMar between 1997 and 1998. In 1999, ProMar was acquired by SHI. Taylor thereafter served as President of SHI and held a minority interest in SII. Around December 2002, following Trelleborg's acquisition of certain of SHI's assets and operations, including the Seaward Foam-Filled Fenders and Buoys manufacturing business, Taylor was employed as the President of VHS/TEP and sat on its board. Taylor, like March, actively participated in,

implemented, directed, and authorized the unlawful conduct by Seaward and later VHS/TEP described herein. Defendant Taylor authorized and directed VHS/TEP to continue engaging in the unlawful practices described herein after Trelleborg through VHS/TEP acquired Seaward's operations.

25.   Defendant Donald Murray ("Murray") was Chief Financial Officer ("CFO") of Seaward and thereafter obtained a similar position at VHS/TEP after the acquisition of Seaward's operations by Trelleborg. Murray also sat on the board of VHS/TEP during the Class Periods. Murray actively participated in and implemented the unlawful conduct described herein.

26.   Defendant Peter Nilsson ("Nilsson") is the current president of Trelleborg. Nilsson was President of TES between approximately June 1, 2003 and October 1, 2005. Prior to June 1, 2003, Nilsson was head of VHS/TEP. Nilsson actively participated in and implemented the unlawful conduct described herein.

27.   Defendant William Alan Potts ("Potts") is the former CFO of VRS/TEP and held that position during the Class Periods. Potts actively participated in and implemented the unlawful conduct described herein.

28.   Defendant Marine Fenders International ("MFI") is a corporation organized under the laws of the State of California, with its principal place of business located at 909 Mahar Avenue, Wilmington, California, 90744. Defendant

MFI is engaged in the business of manufacturing, distributing and selling Foam-Filled Fenders and Buoys.

29. Defendant Urethane Products Corporation ("UPC") is a corporation organized under the laws of the State of California, with its principal place of business located at 9076 Rosecrans Avenue, Bellflower, California, 90706. UPC was founded in 1976 by Timothy Thermos. UPC manufactures, distributes and sells Foam-Filled Fenders and Buoys and other marine products made from polyethylene foam core with a polyurethane elastomer skin.

30. Defendant Nextwave Marine LLC ("Nextwave") is a limited liability company formed in June 2001 by UPC and SRI, with offices located at 521 North Sam Houston Parkway East, Houston, Texas 77060. Between at least June 2001 and December 2002, Nextwave knowingly acted as an agent of Seaward and UPC with respect to the wrongful conduct described herein.

31. Defendant Gerald Thermos ("Thermos") is an individual presently residing in the State of California. Thermos is the former president of UPC and now owns and operates MFI in Wilmington, California. Thermos actively participated in and implemented the unlawful conduct described herein and directed and authorized the unlawful conduct by UPC and MFI.

32. Defendant Waterman Supply Company, Inc. ("SC") is a corporation organized under the laws of the State of California, with offices located at 910

Mahar Avenue, Wilmington, California 90744. Defendant Waterman is a leading dealer, distributor and manufacturer's representative for Foam-Filled Fenders and Buoys. Additionally, Waterman supplies manufacturers with end-fittings, or "hardware," which are necessary components in producing Foam-Filled Fenders and Buoys.

33.   Defendant Seymour Waterman ("Waterman") has been and is the principal owner of WSC.  Waterman actively participated in and implemented and directed and authorized the unlawful conduct of WSC.

34.   Defendant Plastic Pilings, Inc. ("PPI") is a corporation organized under the laws of the State of California with offices located in Rialto, California.  PPI is a leading manufacturer and supplier of Marine Pilings.

35.   Defendant Andrew Barmakian ("Barmakian") is an individual who conducts business in Rialto, California. Barmakian is the owner and president of PPI.   Barmakian actively participated in and implemented and directed and authorized the unlawful conduct of PPI.

36.   Defendant Maritime International, Inc. ("Maritime International") is a corporation organized under the laws of the State of Louisiana.

37.   Defendant John Deats ("Deats") is the owner of Maritime International. Deats actively participated in and implemented and directed and authorized the wrongful conduct by Maritime International described herein.

38.     Defendant Tomas Crawaack ("Crawaack") was a board member of VHS/TEP during the Class Periods. Crawaack was also the President of Fentek, which is part of the TES division of Trelleborg. Crawaack actively participated in and implemented the unlawful conduct described herein.   Crawaack resides in Germany, but has conducted business in this District during the Class Periods, including the commission of the unlawful conduct described herein.

39.     Defendant ProMar (a.k.a. ProMar LLC or ProMar Corp.) is a business entity with offices located in Clearwater, Virginia, and offices formerly located in Kearneysville, West Virginia and Fort Worth, Texas.

40.     Defendant The Yokohama Rubber Company, Ltd. ("Yokohama") is a Japanese corporation with its principal offices in Tokyo, Japan.

41.     Defendant FenderCare Marine Solutions Limited ("FenderCare") is a business entity that acts as a holding company for a variety of business entities. FenderCare is based in Norfolk, Great Britain.

42.     Defendant James Fisher PLC is a public liability company formed under the laws of the United Kingdom. In March 2005, James Fisher PLC acquired the shares of FenderCare. James Fischer PLC has dominated and controlled FenderCare since its acquisition of that company. James Fisher PLC is based in Norfolk, Great Britain, but has conducted business in the United States via

FenderCare. Through its acquisition of FenderCare, James Fisher PLC has assumed the liabilities of that company.

43. Defendant Bridgestone Corporation, a manufacturer of Marine Fenders and other products, is a Japanese corporation with its principal place of business in Tokyo, Japan.

44. Defendant Bridgestone Industrial Products America, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Nashville, Tennessee. Bridgestone Industrial Products America, Inc. is a subsidiary of BFS Diversified Products, LLC which is a subsidiary of Bridgestone America Holdings, Inc., which is a subsidiary of Bridgestone Corporation. The business entity Bridgestone Industrial Products America, Inc., along with its affiliated companies referenced above, are collectively referred to herein as "Bridgestone."

45. Defendant Sumitomo Rubber Industries, Ltd. ("Sumitomo"), a manufacturer of Marine Fenders, among other products, is a Japanese company with its principal place of business in Kobe, Japan.

46. The following Defendants, among others, participated in the conspiracy to fix prices, rig bids and allocate markets for Foam-Filled Fenders and Buoys ("Foam-Filled Fenders and Buoys Defendants"): Trelleborg; VHS/TEP; Fentek; SII; SHI; UPC; MFI; Nextwave; WSC; Maritime International; James Fisher, PLC;

ProMar; FenderCare; Waterman; March; Taylor; Murray; Nilsson; Thermos; Deats; and Crawaack.

47.    The following Defendants, among others, participated in the conspiracy to fix prices, rig bids and allocate markets for Marine Pilings ("Marine Pilings Defendants"): Trelleborg; SII; SHI; VHS/TEP; PPI; UPC; Thermos; Barmakian; Potts; Taylor; Crawaack; Nilsson; March and ProMar.

48.    The following Defendants, among others, participated in the conspiracy to fix prices, rig bids and allocate markets for Marine Fenders ("Marine Fenders Defendants"): Trelleborg; VHS/TEP; Fentek; ProMar; Taylor; Yokohama; FenderCare; Crawaack; Deats; James Fisher PLC; Bridgestone; Maritime; WSC; and Sumitomo.

## UNNAMED CO-CONSPIRATORS

49.    Various other companies and individuals not named as Defendants in this Complaint participated as co-conspirators in the unlawful acts complained of and performed acts and made statements in furtherance of the unlawful conduct.

## INTERSTATE TRADE AND COMMERCE

50.    Throughout the Class Periods, there has been a continuous and uninterrupted flow of sales of Foam-Filled Fenders and Buoys, Marine Pilings and Marine Fenders in interstate commerce.

## THE FOAM-FILLED FENDERS AND BUOYS INDUSTRY

51.    Foam-Filled Fenders are structural protection products that have both high energy absorption and low reaction force. These marine devices protect ship-to-ship and ship-to-dock applications by limiting the amount of force applied to dock structures during berthing and mooring.  Foam-Filled Fenders are an integral part of protecting large multi-use docks, wharfs and piers.  They require minimal upkeep and maintenance.  Foam-Filled Fenders are equipped with permanent end fittings, ("hardware") made of steel, so that the Foam-Filled Fenders can be mounted to vessels and/or berthing facilities.

52.    Buoys are used in a variety of applications, including as channel markers and navigational aids.  Foam-Filled Fenders and Buoys have peculiar characteristics and uses as compared to other types of marine fenders and buoys. These devices are fabricated from a resilient foam that allows them to absorb impact without damage to either vessel or buoy, and makes these products unsinkable, even if punctured.

53.    Due to this internal energy absorption, vessels striking a foam-filled fender or buoy typically will not rebound from the berth.  Additionally, foam-filled marine products are protected by a thick outer polyurethane elastomer skin, which makes them far more resistant to the degrading effects of chemicals, ozone and oil than are other types of fendering systems.

54.   During the Foam-Filled Fenders and Buoys Class Period (defined below), Seaward (subsequently VHS/TEP), UPC and MFI were the dominant manufacturers of Foam-Filled Fenders and Buoys used for commercial applications in the United States.

## THE MARINE PILINGS INDUSTRY

55.   Marine Pilings are reinforced synthetic pilings, resembling telephone poles, that are used in port and pier construction projects. VHS/TEP and, before it, Seaward have manufactured and sold Marine Pilings under the names Seapile and SI Plastic Products, among others.

56.   During the Marine Pilings Class Period (defined below), Seaward (subsequently VHS/TEP) and PPI were the primary manufacturers of Marine Pilings in the United States.

## THE MARINE FENDERS INDUSTRY

57.   In addition to Foam-Filled Fenders, other fenders marketed in the marine products industry include, but are not limited to, fixed fenders and pneumatic fenders.

58.   A pneumatic fender is an energy-absorbing system used in marine safety applications to protect vessels and berthing stations from collision. Pneumatic fenders are composed of compressed air housed in a barrel-shaped bag that helps absorb impact energy. Pneumatic fenders have valves that control and

monitor air pressure. These valves are essential to their functionality - if the internal pressure rises too high, a pneumatic fender can break, thus reducing its effectiveness.

59. Pneumatic Fenders are suitable for a variety of applications including, but not limited to, tankers, gas carriers, bulk cargo ships, and rapid response fendering. Pneumatic fenders float like Foam-Filled Fenders, but are typically filled with air, or in some cases, with air and water (hydro-pneumatic fenders).

60. A fixed fender is a stationary cushion that is placed on a pier or piling to prevent damage from berthing vessels. Fixed fenders can be used in fender systems, either attached to a dock or attached to a piling. They are manufactured in a variety of shapes and sizes with geometric configurations including, but not limited to, arches, cells, cones, cylinders, and rectangles.

**THE FOAM-FILLED FENDERS AND BUOYS CONSPIRACY**

61. Beginning at least as early as June 2000, the Foam-Filled Fenders and Buoys Defendants and their co-conspirators participated in a continuing conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain or stabilize prices, rig bids and allocate the market and customers for Foam-Filled Fenders and Buoys in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. 12 § 1.

**Gerald Thermos, UPC, Frank March, Robert Taylor, and Seaward**

62.    UPC was founded in 1976 by Timothy Thermos.  Upon his death in 1995, ownership of the company was transferred to his wife Elizabeth Thermos.  At or about the same time, their son, Defendant Gerald ("Jerry") Thermos took over as UPC's President, a capacity in which he continued to serve until approximately April 28, 2004.

63.    Between the mid 1990s and April 2004, Seaward (subsequently VHS/TEP) and UPC were the dominant manufacturers in the United States of Foam-Filled Fenders and Buoys.

64.    Thermos served as President and Managing Director of UPC from 1995 until his resignation on April 28, 2004.

65.    In early 1999, March and Thermos communicated with each other regarding a consulting agreement, which March had presented to Thermos.  The draft consulting agreement proposed an arrangement between UPC and Seaward, by which the two would share confidential competitive information about bids and other information on pending projects.  Thermos told March in a February 1999 letter that he had been advised by UPC's antitrust counsel that the agreement was inappropriate and not acceptable.  He indicated that "UPC cannot and will not discuss with you, any information concerning the pricing, terms or conditions of any bid, or our decision as to whether or not we intend to bid on a particular project."

66.   Notwithstanding Thermos' February 1999 letter, conspiratorial discussions between the parties resumed.   In June 2000, Thermos met with, among others, March and Taylor in Baltimore, Maryland.   March subsequently wrote to Thermos regarding the meeting and the terms of a proposed agreement pursuant to which Seaward and UPC would divide the United States market for Foam-Filled Fenders and Buoys as follows: 70% to Seaward and 30% to UPC.   As part of the agreement, March's letter proposed a payment of $3 million dollars by Seaward to Thermos personally as compensation for "consulting services."

67.   On or about August 15, 2000, Taylor wrote to Thermos concerning the ongoing discussions regarding the proposed so-called "joint venture" between Seaward and UPC.   The letter outlined terms acceptable to Seaward, noting that Seaward's management and owners had reviewed the main points at issue remaining between the parties.   Among the terms referenced in the letter and its attachment was the same 70/30 production split previously referenced by March.   An agreement was memorialized soon thereafter.

68.   Pursuant to their unlawful agreement, beginning in approximately June 2000 and continuing through April 2004, Seaward (later VHS/TEP) and UPC coordinated their pricing and bids on projects so as to: (i) distribute their cumulative manufacturing work 70% to Seaward (later VHS/TEP) and 30% to UPC, and (ii) raise the price for their products.   Such a result was possible because Seaward (later

VHS/TEP), UPC and/or their distributors were frequently the only Foam-Filled Fenders or Buoys suppliers bidding on the subject projects.

69.   The primary people responsible for the day-to-day execution of the unlawful scheme were Taylor at Seaward (later VHS/TEP) and Thermos at UPC.  In furtherance of the scheme, Taylor and Thermos regularly exchanged correspondence concerning proposed bids, pricing and related matters during the Foam-Filled Fenders and Buoys Class Period.

70.   During the Foam-Filled Fenders and Buoys Class Period, price lists for Foam-Filled Fenders and Buoys sold by the two companies were frequently identical for comparable products.

71.   The prices charged by UPC and Seaward pursuant to the foregoing price-fixing, bid-rigging, and market allocation scheme were systematically inflated beyond the competitive prices that otherwise would have been charged absent the unlawful agreement.

72.   On or about 2001, UPC and Seaward (prior to its being purchased by Virginia Harbor Services), under the direction of Thermos and Taylor and with the knowledge and acquiescence of Seaward's CEO March, established a joint venture called Nextwave.  Although Nextwave purported to be a legitimate joint venture, in reality it was established as a vehicle to unlawfully fix prices, rig bids and allocate the market and/or customers in the United States for Foam-Filled Fenders and

Buoys. Seaward and UPC used Nextwave to eliminate competition by allocating customers and dividing up the contracts they wanted to win.

73.   The terms of Nextwave's operating agreement ("Operating Agreement") gave representatives of Seaward and UPC unfettered control over Nextwave. Each company had the ability to appoint one manager to oversee the operations of Nextwave. The managers then had the authority to select officers to operate Nextwave. The Operating Agreement named SRI's President Taylor as a manager and president of Nextwave, and it named UPC's President Thermos as manager and vice-president of the company.

74.   The Operating Agreement contained explicit provisions outlining an arrangement by which Seaward and UPC would divide the market for products sold by Nextwave between the two companies. Article 7 of the Agreement, entitled "Company Business," contained the following language:

> 7.1   Allocation of Product Orders All orders for Products of the Company shall be allocated to each Member for production at the discretion of the Managers pursuant to the Sales Representation Agreement, subject to the following:
>
> (a)   Base Line Products[1]- Seventy Percent of the production of Base Line Products shall be allocated to Seaward and thirty percent (30%) of such production shall be allocated to UPC.

---

[1]   "Base Line Products" are defined in Exhibit B to the Agreement as "Foam Filled Fenders" and "Surface Buoys."

(b)    Other Products - All production of Products other than Base Line Products shall be allocated equally to each Member, or as agreed by the Managers.

7.5    <u>Product Pricing</u> The Company shall sell the Products at such prices and on such terms as the Managers may determine in their sole and absolute discretion.

75.    Pursuant to the terms of the Operating Agreement and their pre-existing understanding, Seaward and UPC divided the market for the products in accordance with the Operating Agreement.

76.    In order to keep track of the allocation of projects between Seaward and UPC, Seaward (and later VHS/TEP) generated, *inter alia,* "Order Logs" that identified the production value of contracts awarded to UPC and Seaward (later VHS/TEP) through the course of the year.

77.    In fiscal year 2001, the Order Log generated by Seaward reflected $4,107,627.04 in total orders, with 64.68% being allocated to Seaward and 35.32% being allocated to UPC, as previously agreed.

78.    In fiscal year 2002, the Order Log generated by Seaward had a total cumulative order value of $15,652,774.25 (including revenues from the previous year) with adjusted allocations of 68.09% going to Seaward and 31.91% going to UPC.

79.    The Order Log for fiscal year 2002 (which contained entries through November 18, 2002) provided for "Future Orders to Balance to 70/30," and

specified that $973,704.18 in orders would go to Seaward to achieve the agreed-upon 70/30 ratio.

80.     The Order Log for 2002 further stated that Nextwave sales constituted 22.98% of the total sales by the two entities as of November 18, 2002, but sales by UPC and Seaward outside of Nextwave were still considered in calculating the 70/30 split in production.

81.     Before, during, and after the period of Nextwave's existence, both UPC and Seaward systematically bid directly and indirectly on all projects as if they were independent competitors, without revealing their price-fixing, bid-rigging and market allocation scheme to their customers.

82.     Nextwave was paid hundreds of thousands of dollars in commissions on its sales by UPC and Seaward.

**VHS/TEP**

83.     In or around December 2002, Trelleborg acquired most of SHI's assets and operations (including the Seaward Foam-Filled Fenders and Buoys manufacturing business) and discontinued SHI's participation in Nextwave.

84.     However, Trelleborg continued to participate in the ongoing price-fixing, bid-rigging, and market allocation scheme with UPC through its subsidiary VHS/TEP, which took over the operations of Seaward.

85.    In fiscal year 2003, VHS/TEP generated an Order Log reflecting the same 70/30 distribution of work between VHS/TEP and UPC. The Order Log indicated a total cumulative order value of $26,202,700.32 (including revenues from previous years), with adjusted allocations of 68.27% to Seaward (later VHS/TEP) and 31.73% to UPC, as previously agreed.

86.    The Order Log for 2003 similarly provided for "Future Orders to Balance to 70/30," and specified that $1,486,071.49 in orders would be allocated to Seaward to achieve the agreed-upon 70/30 ratio.

87.    VHS/TEP produced a similar log for "Pending Projects" in early 2004, which contained the same allocation of projects between UPC and VHS/TEP. Even though the projects had not yet been awarded, the log described the anticipated division of those projects between the two manufacturers and the estimated price for products.

88.    In the period 2000 through 2002, Thermos regularly communicated with March and Taylor (among others) at Seaward in furtherance of the price-fixing, bid-rigging, and market allocation scheme involving UPC, Seaward and Nextwave. Following Trelleborg's acquisition of SRI's operations in approximately December 2002, Thermos continued to communicate thereafter with Taylor (among others) at VHS/TEP in furtherance of the same unlawful scheme.

**WSC and Seymour Waterman**

89.    UPC and Seaward (subsequently VHS/TEP) typically sold their products directly to customers such as Plaintiff.  However, they also sold through distributors as well.

90.    UPC's and Seaward's primary distributor was WSC.  WSC had knowledge of and participated in the price-fixing, bid-rigging, and market allocation scheme for Foam-Filled Fenders and Buoys described herein.

91.    Following the ostensible termination of the Nextwave Operating Agreement by VHS/TEP, UPC and VHS/TEP arranged numerous sales pursuant to the unlawful agreement with or through WSC.

92.    UPC and VHS/TEP implemented this new strategy, at least in part so as to maintain the same ratios of production that had previously been agreed to in, among other things, the Nextwave Operating Agreement.

93.    WSC and its owner Waterman had knowledge of the unlawful price-fixing, bid-rigging, and market allocation scheme and participated in its execution both before and after the termination of the Nextwave Operating Agreement. Correspondence was regularly exchanged between WSC management and Taylor or Thermos, which indicated that WSC and Waterman were well aware of the fact that UPC and Seaward (later VHS/TEP) were sharing confidential pricing information and acting collusively on pending projects.

94.     One example of a project where WSC participated with UPC and Seaward in the price-fixing, bid-rigging, and market allocation scheme was the Earle Naval Weapons Station Facility in Leonardo, New Jersey.  On or about July 16, 2001, WSC's manager Max Mougan requested that Thermos give WSC a quote on 20 Marine Guard Fenders for the Earle facility.   This information was communicated to Taylor by Thermos.  On September 7, 2001, Taylor sent an email to Thermos, suggesting a per unit price that they should bid on the Foam-Filled Fenders, and proposing that they give Mougan a 5% commission on the project.  On or about December 11, 2001, Seaward quoted Midatlantic Construction a price of $25,350 per unit for the Foam-Filled Fenders with domestically produced hardware and $23,650 with imported hardware. A copy of the bid was later provided by Taylor to WSC.  On January 14, 2002, Midatlantic Construction requested a quote from UPC on the same project. Thermos sent a quote to Midatlantic Construction, specifying a minimum price of $24,000 per fender. This information was also provided to WSC.  Pursuant to the unlawful arrangement, WSC priced the Foam-Filled Fenders at $23,600 per fender and was therefore the successful bidder.

95.     Taylor sent a letter on or about January 28, 2002 to Mougan (which was copied to Thermos) reminding Mougan, "[a]s we discussed the plan is to process this order through our JV, Nextwave Marine." The order was subsequently

run through Nextwave, and was entered in the log beside Order Date January 28, 2002 with "Waterman" specified as the customer.

96.    On January 18, 2002, Mougan sent a purchase order to Thermos and Taylor, along with a copy of the agreement showing the price at which the Foam-Filled Fenders had been sold. On a cover post-it note, he asked that WSC's net cost (i.e., the price per unit WSC would receive) be filled in by "Jerry/Bob".    The number entered onto the purchase order was "$20,805 each."    In follow-up correspondence to Thermos dated January 29, 2002, Mougan noted that WSC had collected a 5% commission on the sale and that part of the sale price would also pay for hardware supplied by WSC.    Accordingly, the scheme outlined by Taylor in his September 7, 2001 email to Thermos proceeded essentially as planned, with a 5% commission and other benefits going to WSC as a payment for its participation in the scheme.

97.    When WSC purchased products from Nextwave, UPC or Seaward (later VHS/TEP) during the Foam-Filled Fenders and Buoys Class Period (defined below), such purchases were made for distribution to WSC's customers pursuant to the same scheme described above. WSC and Waterman then profited from commissions on the sales, and WSC profited from the sale of hardware accompanying the products, as WSC was the principal supplier of hardware to both UPC and Seaward (later VHS/TEP) prior to Thermos' departure from UPC.

98.    In approximately May 2004, Douglas Farrow and his brother Kenneth Farrow visited WSC to meet with Waterman and Mougan.  In that meeting, Douglas Farrow asked about Nextwave.   Mougan responded, in Kenneth Farrow and Seymour Waterman's presence, that Nextwave was just an idea of Taylor and Thermos that had never come into operation.  In fact, WSC was one of Nextwave's primary customers. In 2002, almost half of Nextwave's revenues came from sales of products to WSC.  Waterman signed the checks made out to Nextwave by WSC for the Foam-Filled Fenders and Buoys purchased during that period.

**Maritime International and John Deats**

99.    Maritime International was another distributor used by UPC and Seaward (later VHS/TEP) during the Foam-Filled Fenders and Buoys Class Period.

100.    Maritime International and John Deats had knowledge of and participated in the unlawful price-fixing, bid-rigging, and market allocation scheme of UPC and Seaward (later VHS/TEP) described herein. Maritime International and John Deats bid on projects with the knowledge that UPC and Seaward (later VHS/TEP) were coordinating their bids on the same projects.   Maritime International and Deats coordinated their bids with UPC and Seaward on the same projects.

101.    One example of Maritime International and Deats' knowledge and participation in the price-fixing, bid-rigging, and market allocation scheme is in an

email dated December 12, 2003, wherein Deats wrote to Thermos expressing his concerns about a Seaward bid on a project titled Dakota Bulk.  In his message, he states "Seaward quoted $14,500 through a local agent (Spectra)???  What the F?!???!!???  I thought that you all had talked about this job?"

102.   In an email dated September 30, 2003, Deats passed along confidential information concerning another project, then added "[L]et me know if you already know about this (or if Bob told you about it)."

103.   In another email dated November 14, 2002, Deats wrote: "What about the hardware stuff from Bob??  Did ya'll standardize things so that we can begin pricing stuff for you???"

104.   Plaintiff is informed and believes that "Bob" in both of the foregoing emails refers to Robert Taylor at Seaward.

**FenderCare**

105.   FenderCare sells Foam-Filled Fenders on behalf of Maritime International and has agreed to and participated in the price-fixing, bid-rigging, and market allocation scheme involving Foam-Filled Fenders as well.

**MFI**

106.   Thermos resigned from UPC in April 2004 after a dispute with Elizabeth Thermos concerning the ownership of UPC and alleged misuse of corporate funds by him.