107.   At or about the time of his resignation from UPC, Thermos created MFI, a company which also manufactures Foam-Filled Fenders and Buoys. Thermos took equipment, trade secrets, and all of the staff from UPC to start and operate MFI.

108.   As a result, MFI was fully operational only weeks after being incorporated, while UPC was crippled and unable to compete in the market for Foam-Filled Fenders and Buoys.

109.   UPC ceased being a participant in the Foam-Filled Fenders and Buoys conspiracy on or about April 28, 2004 and was immediately replaced by MFI.

110.   Beginning in April 2004, throughout the Foam-Filled Fenders and Buoys Class Period (defined below), MFI, Thermos and VHS/TEP continued, in cooperation with WSC, Maritime International, and others, the same price-fixing, bid-rigging and market allocation conspiracy.

**Fentek and Thomas Crawaack**

111.   During the Foam-Filled Fenders and Buoys Class Period (defined below) and Marine Fenders Class Period (defined below), Fentek sold Foam-Filled Fenders and Buoys as well as Marine Fenders.

112.   Fentek had knowledge of VHS/TEP's wrongful conduct described herein and authorized and directed such wrongful conduct through, among others, its President, Tomas Crawaack, who also sits on VHS/TEP's board.

-32-

113.   Crawaack actively participated in directing and authorizing the price-fixing, bid-rigging, and market allocation scheme described herein involving Seaward (later VHS/TEP) and UPC and MFI through, among others, meetings, conversations and/or other communications with Thermos and Taylor throughout the Foam-Filled Fenders and Buoys Class Period.

114.   In 2004 and 2005, Douglas Farrow spoke with Crawaack regarding UPC on multiple occasions.  In those conversations, Crawaack acknowledged that VHS/TEP and UPC had coordinated their bidding in the past (i.e., prior to the time that Thermos left UPC), and he explicitly expressed a desire for UPC and MFI (Thermos' current company) to reunite, and for UPC, MFI, and VHS/TEP to continue the unlawful price-fixing, bid-rigging, and market allocation conspiracy. Crawaack indicated that his motivation for the continuing arrangement was to increase profitability for the participants in the scheme.

**Larry Lizotte**

115.   Larry Lizotte was employed at UPC's office in Bellflower, California during the Foam-Filled Fenders and Buoys Class Period as a manager for the company.  Lizotte resigned at or about the time that Thermos left UPC in April 2004, after which he joined Thermos at MFI.

116.   Lizotte was aware of and participated in the ongoing price-fixing, bid-rigging and market allocation scheme between UPC and Seaward (later VHS/TEP)

from approximately 2000 through his resignation in April 2004.  Lizotte continued to assist in the price-fixing, bid-rigging, and market allocation scheme after leaving UPC and joining MFI through at least August 2005.

117.   Lizotte assisted in the implementation of the scheme by, among other things, preparing collusive bids on projects, communicating with Seaward (later VHS/TEP) regarding pending projects, and regularly tracking the projects that were to be divided between the two companies.

118.   For example, on or about August 28, 2001, Seaward faxed to UPC a copy of Seaward's bid on a United States Navy project at Pier 12 in Norfolk, Virginia.  The price set forth in Seaward's quote was $595,400 for 26 Foam-Filled Fenders.

119.   Seaward also sent, via the same fax to UPC, a list of plan-holders on the project *(i.e.,* the contractors who might perform the work).  Some of the names on the list were checked, some were stricken, and others had "NO" written beside them.

120.   Lizotte prepared a quote on behalf of UPC for the project. The quote was in the amount of $625,950 for the same size Foam-Filled Fenders referenced in the Seaward quote. The UPC quote was then sent by Lizotte to the plan-holder names checked on the list provided by Seaward.  There was no substantive cost

estimating information by UPC pertaining to the project.   Consistent with their scheme, the project was subsequently awarded to Seaward.

121.   The logs reflecting the division of projects between UPC and Seaward (later VHS/TEP) were kept on Lizotte's computer, among others.   The Pier 12 project is reflected in the log as awarded to Seaward with the customer name "Marine Cont. - Pier 12 Norfolk" and an Order Date of October 19, 2001.

**ProMar, LLC**

122.   Taylor created a company named ProMar, LLC in or around 1997, which was engaged in the Foam-Filled Fenders and Buoys business.

123.   Taylor operated ProMar in the same manner that he did at Seaward. That is, he unlawfully shared confidential pricing information and coordinated bids with competitors in advance of contracts being awarded by customers and without the knowledge of those customers.

124.   In 1998, ProMar was teaming up with Seaward on bids.  On or about December 23, 1998, Taylor wrote to Thermos on behalf of ProMar, expressing his desire to work together. He also discussed ProMar's pending bid at the time on a project in Singapore and separately faxed Thermos a copy of a December 23, 1998 letter by ProMar to Bridgestone, which discussed ProMar's possible role in the project.

125. On January 11, 1999, Andrew Hill wrote on behalf of ProMar to Thermos. In the letter, Hill stated that, based on his conversations with March and the owners of ProMar, "a consolidation of the industry seems to be important to all of us." He then detailed possible arrangements for merging all of the competitors into one entity.

126. On January 15, 1999, Taylor wrote to Thermos, again under ProMar letterhead, to discuss arrangements for March, Taylor and Thermos to meet in Los Angeles. The letter expressed Taylor's desire "to make this work" and his belief that it "can really be good for all of us."

127. In 1999, SHI acquired ProMar. UPC and SHI thereafter entered into the price-fixing, bid-rigging, and market allocation scheme.

128. In 2002, certain of SHI's assets and operations were purchased by VHS/TEP, including the Seaward Foam-Filled Fenders and Buoys manufacturing operation.

129. During the Foam-Filled Fenders and Buoys Class Period (defined below) and Marine Fenders Class Period (defined below), ProMar filed collusive bids on numerous Foam-Filled Fenders and Buoys projects as part of the ongoing unlawful price-fixing, bid-rigging, and market allocation scheme involving, among others, its principal Taylor.

**Donald Murray**

130.   Donald Murray was CFO of Seaward and then moved into a similar position at VHS/TEP after the acquisition of Seaward's operations by Trelleborg.

131.   Murray was involved in the unlawful price-fixing, bid-rigging, and market allocation scheme from January 2002 (and likely earlier) through at least early 2004 (and likely later).

132.   Murray participated in preparing the Order Logs described above that were used by Seaward (later VHS/TEP) and UPC to coordinate their conspiracy. On or about January 7, 2002, Murray sent a fax to Thermos' accountant, with the Nextwave Order Log as of that date attached. On the cover sheet, Murray referred to the log as the "Order Log I keep."

133.   The Order Logs used by UPC and Seaward (later VHS/TEP) were produced on Excel spreadsheets. Murray's name appears as the author in the properties section of at least one of the logs/spreadsheets.

134.   Murray also participated in the preparation of the logs with knowledge that they were to be used in implementing the unlawful price-fixing, bid-rigging, and market allocation scheme described herein.

135.   Murray also prepared financial statements for Nextwave and participated in direct communications with Thermos and his accountant Neil Xavier

regarding Nextwave's financials. For example, on or about January 22, 2002, Murray sent a fax to Taylor, with the Nextwave order log for 2001 attached.

136.   In his message to Taylor, Murray wrote that he had determined the amount of "commissions" to be paid to Nextwave by UPC and Seaward, based on the total sales by the two entities.  He wrote this message while aware of the fact that no orders had even been placed with Nextwave as of that date, i.e., that it was simply a vehicle for allocating sales between the two entities.  Murray's knowledge on this point is reflected in another fax message he sent on January 7, 2002 to Thermos' accountant Xavier, where Murray wrote the following: "In January there will be actual orders processed through Nextwave.  Through December, everything was on a commission basis."

137.   Murray thus participated in and furthered the conspiracy in which projects were allocated between UPC and Seaward, and certain of the profits were directed to Nextwave and then on to the principals in the conspiracy.  The financial data included journal detail reports, which reflected large payments by Nextwave directly to Thermos.

138.   As late as February 21, 2003, Murray was also providing similar financial information regarding Nextwave's operations directly to Thermos.

**Peter Nilsson**

139. Peter Nilsson is the current president of Trelleborg.  Nilsson was President of TES between approximately June 1, 2003 and October 1, 2005.  Prior to June 1, 2003, Nilsson was head of VHS/TEP. During the Foam-Filled Fenders and Buoys Class Period (defined below), Nilsson also sat on VHS/TEP's Board of Directors.

140. During the Foam-Filled Fenders and Buoys Class Period (defined below), Nilsson authorized, directed and approved the price-fixing, bid-rigging, and market allocation scheme involving Foam-Filled Fenders and Buoys.  Nilsson directed, encouraged and approved such conduct via multiple communications between 2002 and 2004 with other Trelleborg personnel, including, but not limited to Crawaack, who sought and received Nilsson's approval for Trelleborg to participate in the scheme.

141. Nilsson engaged in communications regarding the price-fixing, bid-rigging, and market allocation scheme, directly or indirectly, with various Defendants who ultimately reported to him at Trelleborg, including Defendants that have pleaded guilty to their participation in conspiracies to fix prices of Foam-Filled Fenders and Buoys and Marine Pilings.  Nilsson's direction, authorization and approval of this conduct continued throughout the Foam-Filled Fenders and Buoys Class Period, including the period after he became president of Trelleborg.

**Criminal Pleadings to Date**

142. A number of the Foam-Filled Fenders and Buoys Defendants have pleaded guilty to participating in a conspiracy to allocate customers and rig bids for Foam-Filled Fenders and Buoys in the United States in connection with a criminal investigation launched by the DOJ.

143. On or about June 9, 2006, Thermos entered into a plea agreement with the DOJ pursuant to which he agreed to plead guilty to "a single count criminal information charging him with participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere from in or about June 2000, continuing until in or about August 2005, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." The plea agreement provided, upon the satisfaction of certain conditions, for the DOJ to recommend that Thermos pay a $50,000 criminal fine and serve a sentence of eight months, including four months in jail and four months of supervised release. The plea agreement was filed on September 15, 2006. Thermos was subsequently sentenced to jail time which he has now served.

144. On or about February 14, 2007, Taylor entered into a plea agreement with the DOJ pursuant to which Taylor agreed to "waive indictment and plead guilty to a three count criminal information charging the defendant with: (1) participating

in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere from at least as early as June 2000, continuing until as late as August 2005, in violation of the Sherman Antitrust Act. 15 U.S.C. § 1; (2) participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of plastic marine pilings in the United States and elsewhere from at least as early as December 2000 until as late as May 2003, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (3) participating in a conspiracy to corruptly give, offer or agree to give money with the intent to influence an agent of the New York City government in connection with a series of transactions from at least as early as January 2000 until at least December 2002, in violation of 18 U.S.C. §§ 371 and 666."

145. The plea agreement provided, upon the satisfaction of certain conditions, for the DOJ to recommend that "the Court impose a sentence requiring the defendant to pay to the United States a criminal fine of $100,000 and to serve a jail term of thirty (30) months of incarceration." The plea was filed on May 10, 2007 in the United States District Court for the Eastern District of Virginia. Taylor was subsequently sentenced to serve jail time for his offense.

146. On or about June 6, 2007, Murray entered into a plea agreement with the DOJ, pursuant to which he pleaded guilty to, *inter alia,* the following charges in

-41-

the criminal information filed against him on the same date: "Beginning at least as early as December 2002 and continuing until as late as January 2004, the exact dates being unknown to the United States, the defendant participated in an ongoing combination and conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere." Murray was subsequently sentenced to serve 18 months in prison, fined $75,000, and required to pay $224,269.89 in restitution.

147.   On or about June 15, 2009, Virginia Harbor Services entered into a plea agreement with the DOJ, pursuant to which it pleaded guilty to: (i) participating in a conspiracy between December 2002 and August 2005 to allocate customers and rig bids for contracts of Foam-Filled Fenders and Buoys sold in the United States and elsewhere; and (ii) participating in a conspiracy between December 2002 and May 2003 to allocate customers and rig bids for contracts of Marine Pilings. Virginia Harbor Services was subsequently fined $7,500,000.

148.   On June 30, 2009, March entered into a plea agreement with the DOJ, pursuant to which he pleaded guilty to, *inter alia,* the following charges in the criminal information filed against him on the same date: "Beginning in or about June 2001 and continuing until in or about December 2002, the exact dates being unknown to the United States, the defendant participated in an ongoing combination and conspiracy to suppress and eliminate competition by allocating customers and

-42-

rigging bids for contracts of foam-filled marine fenders and buoys in the United States and elsewhere." March was subsequently sentenced to 18 months in prison and fined $100,000.

## THE MARINE PILINGS CONSPIRACY

149.   Beginning at least as early as January 2000, the Marine Pilings Defendants and their co-conspirators participated in a continuing conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain or stabilize prices, rig bids and allocate the market and customers in the United States for Marine Pilings in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.   Seaward (later VHS/TEP) engaged in the same practice and pattern of unlawfully fixing prices, rigging bids and allocating the market for Marine Pilings with PPI as it did with UPC. The Marine Pilings conspiracy was intertwined with the Foam-Filled Fenders and Buoys conspiracy, as many of the same Defendants were involved.

151.   Thermos has had a close relationship with the owners and/or management of PPI from at least the late 1990s.   UPC sold chemicals to PPI. Moreover, even though UPC was not involved in the Marine Pilings business, Thermos included advertising for PPI's Marine Pilings on UPC's website until his departure from UPC, and Barmakian (PPI's President) frequently met with Thermos at UPC to discuss the operations of the respective businesses.

152.   During the Marine Pilings Class Period (defined below), Thermos and UPC also had possession of Seaward's confidential pricing information on Marine Pilings.

153.   In approximately 2000, Thermos, Seaward, and PPI developed a plan for the coordinated sales of PPI and Seaward's Marine Pilings through a so-called "joint venture" managed by Taylor, Barmakian and Thermos. Meetings were held among UPC, PPI and Seaward in California around October 2000 regarding the scheme, and documents were drafted describing how the operation would work.  As with Nextwave, the scheme provided that sales by the joint venture entity would be allocated according to "target production ratios" for Seaward (later VHS/TEP) and PPI. Moreover, if Seaward (later VHS/TEP) or PPI sold directly to customers, the plan provided for the same target ratios to be observed. March, the principal of Seaward, was aware of and approved the plan.

154.   As a result of the plan, since approximately 2000 through at least 2006, PPI and Seaward (later VHS/TEP) engaged in a practice of price-fixing, bid-rigging, and market allocation of Marine Pilings in the United States and have systematically charged supra-competitive prices to customers.

**Criminal Pleadings to Date**

155.   A number of Defendants, including Virginia Harbor Services/TEP and Taylor (discussed above), have pleaded guilty to participating in a conspiracy to

allocate customers and rig bids for Marine Pilings sold in the United States in connection with a criminal investigation launched by the DOJ.

156.   On September 24, 2007, VHS/TEP's CFO William Alan Potts entered into a plea agreement pursuant to which he agreed to plead guilty to a single count criminal information charging him with participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of Marine Pilings sold in the United States and elsewhere from as early as December 2002 and continuing until as late as May 2003 in violation of the Sherman Antitrust Act, 15 U.S.C., § 1. Potts was sentenced in June 2008 to pay $60,000 and serve a sentence of six months in jail.

157.   On November 17, 2008, Andrew Barmakian entered into a plea agreement with the United States pursuant to which Barmakian agreed to plead guilty to a single count criminal information charging him with participating in a conspiracy to suppress and eliminate competition by allocating customers and rigging bids for contracts of Marine Pilings from as early as December 2000 and continuing until as late as May 2003 in violation of the Sherman Antitrust Act, 15 U.S.C., § 1. Under the plea agreement, which is subject to court approval, Barmakian has agreed to serve a sentence and pay a criminal fine to be determined by the court.

## THE MARINE FENDERS CONSPIRACY

158.   Beginning at least as early as January 2000, the Marine Fenders Defendants and their co-conspirators participated in a continuing conspiracy in unreasonable restraint of trade to fix prices, rig bids and allocate the market for Marine Fenders in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

159.   Most pneumatic fenders sold in the United States between at least 2002 and the present have been manufactured by Yokohama, which has had a worldwide share of the pneumatic fender market ranging from approximately 60-80% in recent years. Bridgestone and Sumitomo also manufacture pneumatic fenders which are sold in the United States.

160.   Since approximately 2002, Fentek and Trelleborg have been notably absent from the Marine Fenders market in the United States, despite the fact that Fentek sells pneumatic fenders, and Trelleborg and Fentek have had offices in the United States that offer Marine Fenders. Upon information and belief, Fentek has not bid on pneumatic fenders projects in the United States that it was otherwise qualified to bid on.

161.   By contrast, in Europe, Trelleborg/Fentek has been a market leader in the sale of Marine Fenders in recent years, and Yokohama has not competed with them in Europe for the sale of Marine Fenders. The reason for the lack of

competition in the foregoing markets is an unlawful and anticompetitive agreement between, among others, Yokohama and Trelleborg/Fentek to divide the worldwide market for Marine Fenders, so that both companies can reduce competition by not competing with each other and thereby charge higher prices for those products.

162.   In 2003, UPC and ProMar both submitted bids in response to a request for bids by the Navy for pneumatic and hydro-pneumatic fenders.  At the time that UPC and ProMar made their bids, Taylor and UPC were engaged in the price-fixing, bid-rigging, and market allocation scheme for Foam-Filled Fenders and Buoys. Both offered the same type of Marine Fenders with their bids.  Notably, however, despite the fact that Taylor was president of the Trelleborg subsidiary VHS/TEP at the time that ProMar submitted its bid on the above project, ProMar did not propose to provide pneumatic fenders supplied by Fentek.  Instead, both ProMar and UPC proposed to provide Marine Fenders made by HS R&A, Ltd., a Korean firm.

163.   The reason ProMar offered pneumatic fenders made by HS R&A, Ltd. in 2003 was due to a pre-existing agreement between Trelleborg and Yokohama which provided that Trelleborg and Fentek would not compete with Yokohama in the pneumatic fenders market in the United States.

164.   In or around October 2004, Farrow spoke with Kota Kusaba, a representative of Yokohama. In that conversation, Kusaba acknowledged that Yokohama had a working relationship with Taylor and was familiar with ProMar.

165.   FenderCare Marine Solutions has had exclusive rights to represent Yokohama in the United States during the Marine Fenders Class Period. During the Marine Fenders Class Period, FenderCare has handled about 60% of Yokohama's manufacturing output.   Plaintiff is informed and believes that Yokohama entered into its price-fixing, bid-rigging and market allocation scheme with the full knowledge and complicity of FenderCare.

166.   During the Marine Fenders Class Period, Bridgestone also manufactured pneumatic fenders. Bridgestone participated in the price-fixing, bid-rigging, and market allocation scheme described above with regard to Marine Fenders, including pneumatic fenders. Taylor was in communication with representatives of Bridgestone regarding Marine Fenders projects starting as early as approximately 1998 and continued such communications thereafter as well.

167.   During the Marine Fenders Class Period, Sumitomo manufactured Marine Fenders, including fixed and pneumatic fenders. Sumitomo participated in the price-fixing, bid-rigging, and market allocation scheme described above with regard to Marine Fenders. Relevant Marine Fenders marketed by Sumitomo include, but are not limited to, pneumatic, F-type, PB-Type, hollow cylindrical, D-type, circular type, Pi-type, Ultra Pi-type, V-type, Lambda-type, beta-type, fishery-type, special-type, scaffold-type, and corner protectors.

168.   As a result of their unlawful agreement, the prices charged to Plaintiff and the Marine Fenders Class for Marine Fenders made by Yokohama, Bridgestone and Sumitomo were inflated.

## CRIMINAL PLEADINGS IN RELATED MARINE PRODUCTS

## CONSPIRACY

169.   On or around December 2006, Defendant Yokohama struck a deal with the DOJ under the DOJ's corporate leniency program in exchange for amnesty, admitting its participation in a conspiracy to fix prices, rig bids and allocate markets for marine hose and ancillary products in the United States.

170.   On or about April 20, 2009, Trelleborg Industrie S.A.S., a subsidiary of Defendant Trelleborg, pleaded guilty to fixing prices, rigging bids and allocating markets for marine hose and ancillary products in the United States.  Pursuant to its plea agreement, Trelleborg Industrie S.A.S. was fined $3.5 million.

171.   In addition, Trelleborg Industrie S.A.S. and Defendants Yokohama and Bridgestone recently agreed to settle a class action lawsuit for $1,874,000, $1,950,000 and $8,500,000, respectively, which suit alleged their participation in a

# CLASS ACTION ALLEGATIONS

174.   Plaintiff brings this action as a class action under Rules 23(a), (b )(2) and (b )(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Foam-Filled Fenders and Buoys Class" is defined as:

1          from the Marine Fenders Class are the Marine Fenders

each of the Classes. Among the questions of law and fact common to each of the Classes are:

   a.   Whether Defendants conspired to raise, fix, maintain or stabilize the price of, rig bids and allocate the market for Foam-Filled Fenders and Buoys, Marine Pilings, and Marine Fenders in the United States;

   b.   Whether Defendants undertook actions to conceal their unlawful conspiracy; and

   c.   Whether Defendants' conduct violated the relevant U.S. federal antitrust laws and caused injury to the business and property of Plaintiff and the members of each Class and, if so, the proper measure of damages.

181.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of the members of each of the classes is impracticable. The prosecution of separate actions by individual members of each Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to each Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

182.   Each Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members of each Class, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FRAUDULENT CONCEALMENT

183.   Defendants   fraudulently   concealed   their   participation   in   the conspiracies alleged by, among other things, engaging in secret meetings and communications in furtherance of the conspiracies, and by holding themselves out as competitors to the public, to Plaintiff, and to the members of each Class.  Because of such fraudulent concealment, and the fact that a price-fixing conspiracy is inherently self-concealing, Plaintiff and the members of the Classes could not have discovered the existence of these conspiracies any earlier than public disclosures thereof.

184.   Throughout the Class Periods, Defendants and their co-conspirators have affirmatively and fraudulently concealed their unlawful conduct from Plaintiff and the members of the Classes to prevent Plaintiff and the members of the Classes from suing them for the anticompetitive and unlawful conduct alleged in this Complaint.

185. Defendants wrongfully concealed their conspiracies by various means and methods that precluded detection, including but not limited to: secret meetings, surreptitious communications among Defendants via telephone, and in-person

eir competitor pricing

meetings in order to conceal the existence and nature of the

discussions from non-conspirators.

discuss publicly or

186. Defendants agreed among themselves not to

d communications in

otherwise reveal the nature and substance of the acts and

187. Plaintiff and members of the Classes reasonably relied on the

Defendants' materially false or misleading bids and Plaintiff and members of the

Classes were lulled into believing that Defendants' bids were the result of free and

open competition, rather than the product of Defendants' collusive activity

Because the alleged conspiracies were both self-concealing and

ely concealed by Defendants and their co-conspirators, Plaintiff and

affirmativ

of the Classes had no knowledge of the alleged conspiracies, did not know

members

were paying artificially high supra-competitive prices for Foam Filled

that they



, among others, attempted a price-fixing and

market allocation conspiracy involving Foam-Filled Fenders and Buoys; (ii)

bruary 21, 2007 for Marine Pilings, the date the DOJ filed its criminal

limitations period

has been equitably

as a result of the

2  has run.

3

4      193. The running of any applicable statute of limitations

5  tolled as to any claims of Plaintiff and members of the Classes

1

2

197.  The Foam-Filled Fenders and Buoys Defendants' conspiracy and

resulting impact on the market in the United States for Foam-Filled Fenders and

208. As a proximate result of the Marine Fenders Defendants' unlawful conduct, Plaintiff and the Marine Fenders Class have suffered injury in that they

## RELIEF SOUGHT

Accordingly, Plaintiff demands relief as follows:

A. That the Court determine that this action may be maintained as a class

2   Complaint

3

4       D.     That Plaintiff and the Classes recover the da

## DEMAND FOR JURY TRIAL

38(a) of the Federal Rules of Civil Procedure, Plaintiff                    Pursuant to Rule

demands a jury trial as to all issues triable by a jury.

Andrew Esbenshade

CALDWELL LESLIE & PROCTOR, PC